UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

HARTFORD CASUALTY INSURANCE COMPANY, et al.,

Plaintiffs,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,

Defendant.

Case No. 19-cv-06349-RS

**ORDER APPORTIONING COSTS**

## I. INTRODUCTION

This intra-insurer dispute revolves around defense costs. In 2013, aggrieved first-time homebuyer Justin Moore ("Moore") brought an action ("the Moore Action") against San Francisco realtor Richard Teed ("Teed") in California Superior Court. Plaintiffs Hartford Insurance Company and Sentinel Insurance Company (together, "Hartford") immediately took up Teed's defense. Defendant National Union Fire Insurance Company ("National Union") did not, and only ventured into the fray—on a putatively "excess" basis—in 2018. All told, Hartford expended over a million dollars on Teed's behalf.

As explained in a prior order ("the November 2020 Order"), the allegations of the Moore Action triggered both Hartford and National Union's duty to defend. What remains of this controversy is apportionment: how much of the defense bill is rightly borne by National Union? Whereas National Union suggests a fifty-fifty split, Hartford proposes something nearer to ninety-ten. For the reasons set forth herein, equity requires meeting in the middle. National Union is

responsible for 69.12% of Teed's defense costs, and must reimburse Hartford accordingly.

## II. DISCUSSION[1]

The parties disagree over the correct method of apportionment, the total apportionable sum, and the availability of prejudgment interest and prevailing party costs. Both sides lodge persuasive arguments on the first issue, rendering a compromise the most prudent course of action. The latter two, however, fall predominantly in Hartford's favor.

### A. Method of Apportionment

The November 2020 Order determined Hartford's entitlement to substantial reimbursement from National Union under the doctrine of partial equitable indemnity. In California, "courts have expressly and repeatedly refused to formulate a definitive, rigid rule establishing a single method of allocating defense costs in every case." *Centennial Ins. Co. v. United States Fire Ins. Co.*, 88 Cal.App.4th 105, 115 (2001) (collecting cases). Instead, "a trial court has discretion to select a method of allocating defense costs among multiple insurers to produce the most equitable results based on the facts and circumstances of the particular case." *Residence Mut. Ins. Co. v. Travelers Indem. Co. of Conn.,* 26 F.Supp.3d 965, 978 (C.D. Cal. 2014) (citation omitted). This discretion is broad, permitting the court to "consider numerous factors in making its determination, including the nature of the underlying claim, the relationship of the insured to the various insurers, the particulars of each policy, and any other equitable considerations." *See Axis Surplus Ins. Co. v. Glencoe Ins. Ltd.,* 204 Cal.App.4th 1214, 1231-32 (2012) (citation omitted).

Of the many apportionment methods recognized by California law, only two are advanced here. Under the "equal shares" approach preferred by National Union, defense costs are split evenly among the duty-bound insurers. *See Centennial,* 88 Cal.App.4th at 113-14. By contrast, under the "policy limits" method endorsed by Hartford, "apportionment [is] based upon the relative policy limits of each . . . policy[.]" *Id.* at 112 (citations omitted). Because the Moore

---

[1] The parties are familiar with this matter's underlying facts, which previously have been set out in some detail. *See* November 2020 Order, Dkt. 66 at 2-9.

Action implicated two $1 million policies Hartford issued Teed, and one $15 million policy National Union issued Teed, a "policy limits" allocation would saddle National Union with a $15/17^{th}$ share (88.24%) of the loss.

Ultimately, neither side's position quite hits the target of "distributive justice and equity." *Centennial,* 88 Cal.App.4th at 111. Rather—and taking each relevant factor in turn—it is clear that, on these particular facts, that target lies squarely between the dueling proposals.

### 1. Nature of the Underlying Claim

The nature and allegations of the Moore Action cut unmistakably against National Union. Through its policy, National Union insured Teed for professional services liability, covering his errors and omissions in the provision of "real estate agent/broker services."[2] When Moore sued Teed, he brought seven claims[3] going directly to that coverage—that is, to Teed's misrepresentations as a real estate agent. Nor did the focus of the Moore Action shift over time: across trial, judgment and appeal, Moore sought (and secured) damages for harms flowing from his reliance on Teed's pre-sale assertions. In so doing, Moore worked off a complaint that, as the November 2020 Order explains at length, contained a single, stray assertion relating to Teed's coverage with Hartford. As a matter of law, that happenstance was sufficient to activate Hartford's prophylactic duty to defend. *See* November 2020 Order, Dkt. 66 at 10-18. As a matter of equity, though, it does not diminish the Moore Action's overwhelming emphasis on "precisely the sorts of errors and omissions National Union's policy covers." *Id.* at 21.

Hoping to escape this conclusion, National Union stresses that "whether one allegation or a hundred raises the potential for coverage, the scope of the duty to defend . . . is exactly the same." National Union Opp'n, Dkt. 87 at 19 (citation omitted). This statement is true as far as it goes—

---

[2] Hartford covered Teed for a different risk: commercial general liability, stemming from "occurrences" of "property damage." *See* November 2020 Order, Dkt. 66 at 5-8 (explaining Hartford and National Union's distinct forms of coverage).

[3] Breach of oral contract, intentional and negligent misrepresentation, negligence, breach of fiduciary duty, negligence per se, and violation of California's Unfair Competition Law.

namely, to the duty-to-defend analysis. Yet by accepting National Union's invitation to extend it past that point, into the realm of cost-sharing analysis, equitable allocation would become a needless enterprise: even where (as here) one insurer's defense duty is obvious, while another's is just barely triggered, the "sameness" of the duty would control. Put tersely, this is not the law. From any fair perspective, "the nature of the underlying claim" leans almost exclusively to Hartford. *Axis Surplus Ins. Co,* 204 Cal.App.4th at 1231-32 (citation omitted).

### 2. **Particulars of Each Policy**

Unfortunately for Hartford, attention to "the particulars of each policy" cuts, with equal force, in the opposite direction. In its policies with Teed, Hartford included a "Method of Sharing" clause stating:

> If all the other insurance permits contribution by equal shares, *we will follow this method also*. Under this approach, each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

(Emphasis added). For its part—and as Hartford does not seriously debate—National Union's policy "permits contribution by equal shares." Hartford has thus made an *ex ante* decision, expressed in its own policy, to meet scenarios like this one by following the "equal shares" method to which it now stridently objects.

Viewed in isolation, that decision seems fatal to Hartford's plight; but reviewing the very cases National Union offers on this score, it is apparent that such a blinkered, single-factor inquiry would be misguided. In *First Mercury Insurance Company v. Great Divide Insurance Company,* for instance, another trial judge in this district, confronting an analogous policy pairing (in which "both policies provide[ed] for [allocation] by equal shares"), did indeed find "that contribution by equal shares for defense costs" was the "most appropriate" outcome. 241 F.Supp.3d 1028, 1039-40 (N.D. Cal. 2017) (citation omitted). Crucially, though, the analytical lead-up to that finding swept in "the underlying claim, the relationship of the insureds to the insurers, *and* the language of the parties' policies"—not just policy language alone. *Id.* at 1040 (emphasis added); *see also Residence Mut. Ins. Co.,* 26 F.Supp.3d at 979 (applying the "equal shares" method in view of

policy language *and* "the relationship of the mutual insured" with the parties). This holistic manner of review, which comports with an equitable action's aversion to "rigid rule[s]," is likewise warranted here. *See Axis Surplus Ins. Co,* 204 Cal.App.4th at 1229 (citation omitted). Hartford's "Method of Sharing" clause accordingly functions not as a dispositive consideration, but rather as an effective counterweight to the general (National Union-oriented) character of the Moore Action.[4]

### 3. Relationship of the Insured to the Various Insurers

This factor is neutral. In some instances, courts have found an insurer less liable for defense costs where the mutual insured's attenuation from the bargaining process for that insurer's policy left the insured "essentially a stranger to the insurance contract[.]" *See, e.g., Residence Mut. Ins. Co.,* 26 F.Supp.3d at 978. Teed's relationship to the National Union policy doubtless fits this mold: unlike the Hartford policy, under which Teed was a named insured paying his own premiums, National Union's was issued to NRT, "a multi-billion-dollar enterprise . . . who was paying premiums for, and purchasing limits sufficient to cover, its entire brokerage nationwide." National Union Mot., Dkt. 72 at 6. Hartford's speculation that Teed might have satisfied some portion of the National Union policy's premiums through payments to Sotehby's (an NRT subsidiary, and his then brokerage) notwithstanding, Teed undeniably was "closer" to the Hartford contract.

The problem with assigning this factor any weight, though, is that it flows from—and runs headlong into—another common equitable allocation consideration: "the relative amount of

---

[4] In Hartford's view, its "Method of Sharing" clause carries *no* weight, given the November 2020 Order's description of the Hartford policies' "Other Insurance" section—which contains the "Method of Sharing" clause—as, for purposes of apportionment, "inoperative." *See* November 2020 Order, Dkt. 66 at 21. Hartford is mistaken: in handling the parties' respective "Other Insurance" language, the November 2020 Order dealt solely with the degree to which that language sought to establish one side's "excess-only" relationship with the other. *See id.* at 21-22 (referring to "other insurance clauses" and "excess-only clauses" interchangeably) (internal bracketing, quotation marks, and citations omitted). At no point did the November 2020 Order address the impact of Hartford's "Method of Sharing" clause. Setting Hartford's wishful reading of the order aside, that clause properly is taken into account here.

premiums paid." *See Centennial Ins. Co.,* 88 Cal.App.4th at 106. Appealing by a "sort of 'as ye have reaped, so shall ye sow'" logic, this consideration has been criticized by the California Court of Appeal for "ignor[ing] the multitude of different factors that can create differences in liability insurance premiums . . . [and] justify a higher premium for Policy X than for Policy Y without in any way justifying imposition upon the insurer issuing Policy X more of the liability to be apportioned than is imposed upon the insurer issuing Policy Y." *Stonewall Ins. Co. v. City of Palos Verdes Estates,* 46 Cal.App.4th 1810, 1863 (1996). Here, the premiums for Hartford's policies were $425 and $713, while those for National Union's policy tallied roughly $1.6 million. Tempting thought it may be to infer, from these figures, that National Union took on relatively greater risk than Hartford, doing so would err in the same way as crediting Teed's "closeness" to Hartford: by overlooking the essentially different characters of the contracts at issue. In short—and so far as "accomplish[ing] substantial justice" is concerned—there is little to be gleaned from the fact that Teed was absent from negotiating a mega-policy (with mega-sized premiums), covering a great number of persons, but active in the formation of an individual policy (with individual-sized premiums) covering only himself. *See Fireman's Fund Ins. Co. v. Maryland Cas. Co.,* 65 Cal.App.4th 1279, 1293 (1998) (citations omitted).

### 4. Other Equitable Considerations

Taken together, the foregoing factors achieve a rough equipoise favoring "equal shares" apportionment. Turning to the final, catch-all factor, the question thus becomes whether "any other equitable considerations" tend to move the needle. *Axis Surplus Ins. Co,* 204 Cal.App.4th at 1232 (citation omitted).

One does: although both parties were notified of the Moore Action around its outset, only Hartford—the tenuously connected of the two—took up Teed's defense, standing by him for the next five years. National Union, for its part, stood on the sidelines. Were National Union's defense duty in the Moore Action like Hartford's, *i.e.*, subject to reasonable debate, this delinquency perhaps could be disregarded. Yet by any stretch, it is not. Because National Union tarried in the face of a clear call to act, equity compels a corresponding adjustment to the firm's relative share of

the loss. Of course, such adjustment, though necessary to disincentivize future delinquency by similarly-situated insurers, ought not hand Hartford an outright windfall. The parties accordingly shall meet halfway between their opening positions, with National Union reimbursing Hartford until it has borne 69.12% (as opposed to 88.24%) of Teed's defense costs.

### B. Total Apportionable Sum

Perhaps anticipating something in line with the above result, National Union attempts to muddy the issue of the total sum to be apportioned. This effort, which begins with arguments around the National Union policy's Self-Insured Retention ("SIR") component, is unavailing.

#### 1. National Union Policy's Self-Insured Retention

When an insurance contract requires "a specific sum or percentage of loss . . . [to] be satisfied [by the insured] *before* there is any coverage under the policy," the requirement "is often referred to as a 'self-insured retention' or 'SIR'." *Forecast Homes, Inc. v. Steadfast Ins. Co.,* 181 Cal.App.4th 1466, 1474 (2010) (citation omitted). "Unlike a deductible, which generally relates only to damages, an SIR also applies to defense costs and settlement of any claim." *Id.* Pursuant to the National Union policy's SIR, the insured Moore Action defendants—which originally included both Teed and Sotheby's—had to spend $1 million before any National Union defense coverage kicked in. That obligation was satisfied, principally by Sotheby's, as of January 2017. Latching onto this, National Union insists that all costs incurred defending Teed prior to that point be excluded from the total apportionable sum, lest it be held responsible for monies spent before its defense duty fully had matured.

This is, to put it mildly, a losing argument. Had National Union acknowledged its duty to defend when first apprised of the Moore Action, Hartford, prior to incurring any defense costs whatsoever, at the very least would have sought to reach an understanding with National Union regarding the SIR's bearing on shared expenses. Hartford did not do so because it *could* not, given National Union's truancy. Under these circumstances, and as the California Court of Appeal aptly has observed, starting the common defense costs "meter" at the precise moment of the SIR's satisfaction would encourage insurers to "hid[e] behind . . . [SIR] requirement[s], gambling that

. . . [they will not be] satisfied" while other, participating insurers mount the mutually insured's defense. *See Axis Surplus Ins. Co.,* 204 Cal.App.4th at 1228. Because it would have the unwelcome effect of "sanctioning gamesmanship," this rule has no place in the present dispute. *See id.*

### 2. Apportionment Calculation

With National Union's SIR theory in the rearview, the apportionment calculation becomes a mercifully simple affair. Hartford has spent $1,221,070.97 defending Teed, while National Union has spent $190,728.74[5] making Teed whole for certain defense costs he personally incurred and bonding Teed's appeal. The total cost of Teed's defense is thus $1,411,799.71. 69.12% of this sum is $975,835.96, of which National Union already has expended an aforementioned $190,728.74. Before accounting for interest, *see infra* Part II.C, National Union therefore owes Hartford $785,107.22.

### C. Prejudgment Interest & Prevailing Party Costs

Hartford seeks a determination of its entitlement to prejudgment interest and prevailing party costs. Only the former is appropriate. "Regarding prejudgment interest, 'a person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day[.]" *Am. States Ins. Co. v. Ins. Co. of. Pa.,* 800 Fed.App'x 452, 455 (9th Cir. 2020) (quoting Cal. Civ. Code § 3287(a)); *see also id.* (ruling "the district court erred in denying prejudgment interest" after apportioning defense costs among mutually-liable insurers). Hartford, coincident with each of its eighty-three defense expenditures on Teed's behalf between 2014 and 2020, became entitled to "damages . . . capable of being made certain by calculation" (*e.g.*, by apportionment), with each entitlement vesting on the "particular day" of the underlying

---

[5] Hartford, while not actually disputing the fact of National Union having spent this sum, raises evidentiary objections regarding National Union's documentation of each specific expenditure. Because National Union's reply briefing—which includes, for each expenditure, a copy of the corresponding check—irrefutably resolves the defects giving rise to these objections, the objections are overruled. *See* Fletcher Decl. ¶ 3, Dkt. 92-1 at 2.

expenditure. *Id.* Accounting for National Union's 69.12% share of each of these payments, at an interest rate of 7% per annum, less interest attributable to Hartford's 30.88% share of the six payments totaling $190,728.74 made by National Union on Teed's behalf between 2018 and 2020, National Union therefore owes Hartford $188,280.00 in prejudgment interest. As for prevailing party costs, Hartford, beyond a passing reference to Rule 54(d), points to no authority militating for fee-shifting here, and all but abandons this particular request in its reply briefing. Each party consequently shall bear its own costs.

### III. CONLCUSION

Consistent with the discussion above, Hartford is entitled to recover $785,107.22 in damages, plus $188,280.00 in prejudgment interest, from National Union. In all other respects, the parties' motions are denied.[6]

**IT IS SO ORDERED**.

Dated: April 21, 2021

RICHARD SEEBORG
Chief United States District Judge

---

[6] Both parties move to seal a number of exhibits filed in support of their respective briefing. *See* Dkts. 73, 86, 89, 91. Collectively, these motions amount to a narrowly-tailored request that certain potentially sensitive banking data, such as account and routing numbers, be kept from the judicial record. Because these requests do not unduly burden the public's interest in access to court materials, they are hereby granted.